## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**LEROY V. TRUJILLO,**

       Plaintiff,

vs.                                                                 No. CIV 07-1136 LFG

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

       Defendant.

## MEMORANDUM OPINION AND ORDER
## OF LIMITED REMAND

**THIS MATTER** is before the Court on Plaintiff Leroy V. Trujillo's ("Trujillo") Motion to Reverse or Remand Administrative Agency Decision, filed April 24, 2008. [Doc. 11, 12.] The Commissioner of Social Security issued a final decision denying benefits, finding that Trujillo was not disabled and not entitled either to Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI"). The Commissioner filed a response to Trujillo's Motion. [Doc. 15], and Trujillo filed a reply. [Doc. 16.] Having considered the pleadings, the administrative record and the applicable law, the Court finds that the motion to remand will be granted to a limited extent as described herein.

1

# I.  PROCEDURAL RECORD

In June and July 2004,[1] Trujillo applied for DIB and SSI, alleging he was disabled as of December 31, 1998 [Tr. 90], due to a low back injury with two herniated discs.  [Tr. 63, 399.]  In his Adult Disability Report, Trujillo described his condition as an "asimulation of free fragment behind the body of L5.  This is the nerve root of L5 that is exiting and only partially enhancing disc.  Fragment is not seen.  At 2-3 there is slight disc bulge."[2]  [Tr. 94.]  Trujillo stated that these conditions caused him "lots of pain. Pain is so intense gives loss of usage to left leg.  Medication gives memory loss." [Tr. 94.]  On this form, Trujillo identifies February 6, 2004 as the date he first became unable to work because of "severe pain."[3]  [Tr. 94.]  Trujillo had worked for years in automobile painting and body work.  His applications for DIB and SSI were denied at the initial and reconsideration levels.  [Tr. 49, 51, 395, 398, 403.]

On July 19, 2006, the ALJ conducted a hearing, at which Trujillo was represented by counsel.[4]  [Tr. 513.]  On February 23, 2007, the ALJ issued his decision finding that Trujillo was not disabled.  [Tr. 23-36.]  Thereafter, Trujillo filed a request for review.  [Tr. 19.]  On September 14, 2007, after reviewing additional evidence provided by Trujillo, the Appeals Council denied the request for review and upheld the final decision of the ALJ.  [Tr. 8, 12.]  On November 9, 2007, Trujillo filed a complaint for federal court review of the ALJ's decision.  [Doc. 1.]

---

[1]The benefit application forms do not appear to be part of the record, but the initial denials of the applications indicate filing dates of June and July, 2004.  [Tr. 51, 403.]

[2]This language was taken from a 2004 radiology report.  [Tr. 327.]

[3]The information varies as to when Trujillo last worked but is discussed in more detail under the section describing Trujillo's work history and medical treatment.

[4]Present counsel did not represent Trujillo during the underlying proceedings or at the ALJ hearing.  [Doc. 12, p. 2, n. 1.]

Trujillo was born on November 28, 1964 [Tr. 34, 520], and was 41 years old at the time of the ALJ hearing. [Tr. 520.] Although he told the ALJ he was a high school graduate [Tr. 100, 520], he later told a psychiatrist that he had started the 12th grade but had neither completed it nor attempted to obtain a G.E.D. [Tr. 406.] Trujillo received some specialized training in auto body work. [Tr. 100, 406-07.]

## II.  STANDARDS FOR DETERMINING DISABILITY

In determining disability, the Commissioner applies a five-step sequential evaluation process.[5]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[6]

Briefly, the steps are: at step one, claimant must prove he is not currently engaged in substantial gainful activity;[7] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . .;"[8] at step three, the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[9] and, at step four, the claimant bears the burden of proving he is incapable of meeting the

---

[5]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[6]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[7]20 C.F.R. § 404.1520(b) (1999).

[8]20 C.F.R. § 404.1520(c) (1999).

[9]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

physical and mental demands of his past relevant work.[10]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[11] age, education and past work experience, he is capable of performing other work.[12]      The Commissioner may meet the step five burden with vocational expert testimony concerning what work the claimant has the capability to perform. *See* Ragland v. Shalala, 992 F.2d 1056, 1058 (10th Cir.1993). Thus, at step five, the Commissioner must show that the claimant retains sufficient residual functional capacity to perform alternative work that exists in the national economy.  Woolman v. McMahon, 471 F. Supp. 2d 1197, 1204 n. 4 (N. D. Okla. 2007) (internal citations omitted).  If, at step five of the process, the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[13]

In this case, the ALJ relied, in part, on the testimony of a vocational expert ("VE") in determining at step five of the analysis that Trujillo was not under a disability.

### III.  STANDARD OF REVIEW

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and

---

[10]20 C.F.R. § 404.1520(e) (1999).

[11]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[12]20 C.F.R. § 404.1520(f) (1999).

[13]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004). The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards. Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

After carefully reviewing all of the evidence, the ALJ issued a thorough opinion denying Trujillo's requests for benefits.  [Tr. 26-36.]  The ALJ determined, in part, that Trujillo met the

insured status requirements of the Title II (DIB claim) through December 31, 2002.  Because he did

not prove that he was "disabled" prior to or on that date, he was not entitled to DIB benefits.[14]  [Tr.

29.]  The ALJ also concluded that Trujillo had not engaged in substantial gainful activity after

March 4, 2004, the alleged onset date of disability for the SSI claim.  At step two of the sequential

evaluation, the ALJ determined Trujillo had "'severe' back and neck disorders with low back [pain],

neck pain, and bilateral lower extremity pain," but that the impairments or combination of

impairments did not meet listing criteria, in particular, Listing 1.04 ("disorders of spine").  [Tr. 29-

30.]  After carefully reviewing the medical record and opinion testimony, the ALJ concluded that

Trujillo retained the RFC for a limited range of sedentary work that consisted of simple, unskilled

work. [Tr. 30-34.]  Trujillo was unable to perform his past relevant work as a body worker in the

automotive business.  The ALJ summarized the hypothetical provided to the VE at the ALJ hearing

and the VE's testimony regarding what jobs Trujillo could perform.  The ALJ considered Trujillo's

RFC, his age, education,[15] and work experience in conjunction with the Grids.  He concluded that

Trujillo's ability to perform all of the requirements of sedentary work was impeded by additional

limitations and then further refined the hypothetical presented to the VE.  The VE testified that in

light of additional restrictions, Trujillo could perform the job of a surveillance system monitor that

is a sedentary, unskilled job.   [Tr. 35-36.]  Ultimately, the ALJ concluded that Trujillo was not

under a disability as defined by the Act.

---

[14]Trujillo argues that the ALJ erred by amending his onset date to March 4, 2004, thereby ruling him out of a possible DIB claim, and that Trujillo did not consent to the amended onset date.  [Doc. 12.]  The Court addresses this argument *infra*.

[15]Based on the testimony before him, the ALJ concluded that Trujillo had completed a high school education.  However, later in 2007 during an interview with a psychiatrist, Trujillo stated he had not completed high school, nor obtained a G.E.D.  This newer evidence was considered by the Appeals Council.

On September 14, 2007, the Appeals Council considered new evidence submitted by Trujillo but found no basis to review the ALJ's opinion. [Tr. 8, 12.]

## IV.  MEDICAL AND WORK HISTORY

Trujillo was born in California, attended school in California, and began his last year of high school there.  [Tr. 404, 406.]  He never completed high school and did not obtain a G.E.D.  [Tr. 406.]  He worked in automobile body shops during school and was certified in auto body painting. He received some specialized job training.  [Tr. 523.]  Trujillo also worked for an electric company as an electrician's helper sometime prior to 1996.  His last sustained period of employment was as an auto body worker.  He performed that kind of work for a period of years until 1998.  [Tr. 404.] In 2003, he worked for Coloral Technology, a mobile body work company where dents from cars were removed.  After working for six weeks in 2003, he claims he had to stop working because of pain.  [Tr. 409.]

Trujillo's first medical problems began when he was drag racing on a motorcycle at age 25 or 26, which would have been in 1989 or 1990.  He was racing in an "organized lawful" race in California and traveling at a speed of over 150 miles apart when his wheel fell apart.  [Tr. 407.] Trujillo stated to a medical provider that he was involved in a "high velocity motorcycle accident" when employed by a motorcycle company as a racing driver.  [Tr. 177.]  As a result of the accident, Trujillo was injured and hospitalized.  He recovered and worked at some point after the accident.

In 1997 or 1998, Trujillo had back surgery as a result of the motorcycle accident.  [Tr. 120, 526.]  There are no corresponding medical records for that time period.  He reported that he had a L5-S1 decompression and a fusion then.  [Tr. 267.]  He did "remarkably well" after that surgery for six years and then in February 2004, began feeling lower back pain and "shooting pain" on occasion,

for which he went to the Emergency Room (ER).  [Tr. 267.]  Trujillo had several epidural steroid injections but they were of no help.  The pain was "excruciating" and he quit his job as a car body painter/mechanic in 2002-2004.[16]  [Tr. 525.]  He stated at the ALJ hearing that he was leasing space from a friend and doing auto body or mechanic work when he could get it between 2002 and 2004.  [Tr. 525.]

Trujillo has not worked since 2004 and ended up having another back surgery in early 2005 that was not completely successful.  [Tr. 120.]  Trujillo previously filed for DIB in October 1996 but the application was denied, and there was no appeal.  [Tr. 26.]  He had sufficient quarters of coverage to remain insured through December 31, 2002.

Trujillo had been living in a single-wide trailer with his long-standing girlfriend and three children, two of whom were his and his girlfriend's.  The children were 6, 9 and 15 years old.  [Tr. 74, 521.]  He also has two sons from his first marriage, ages 14 and 18.  [Tr. 405.]  He was divorced 13 years ago after an 8-year marriage.  He no longer is with his girlfriend and claims that his pain and dysfunction interfered with the relationship.  Since 2007, he has been living in the garage apartment at the home of his mother and step-father.  [Tr. 404, 405.]  He has a driver's license and drives but testified that it was more and more difficult for him to drive due to vision problems.  [Tr. 522.]

There are a few medical records from 2002 and 2003.  The majority of medical records are from 2004 through 2006.

### 2002 Medical Records

---

[16]The psychiatrist who examined Trujillo in 2007 stated that Trujillo's complete work history was not available due to his poor memory.  [Tr. 409.]

On September 25, 2002, Trujillo presented at the ER for problems related to his mental health.  These are the only medical records documenting serious complaints of anxiety and depression.  [Tr. 363, 364.]  Trujillo was having problems sleeping and complained of edginess, nervousness and pacing.  He had never felt this way before and claimed he had been having these problems off and on for six months.  He denied suicidal or homicidal ideation but said he had trouble dealing with people.  Trujillo had lost 15 pounds in the last six months and suffered from occasional fevers, chills and a sore throat.  His chest felt tight and he was nauseated.  His skin hurt and he had headaches.  He stated he painted cars for a living and always wore safety equipment.

Trujillo initially denied using drugs but later said he had taken amphetamines a few weeks before this date.  He also reported an earlier surgery to his lower back.  He was using Ibuprofen occasionally.  The health care provider noted that hyperthyroidism, diabetes, syphilis, drug use, alcohol abuse, alcohol withdrawal and mania were all considerations.  His final diagnosis was amphetamine usage and anxiety.  Trujillo was prescribed Ativan and slept easily while at the ER. He was told to stop using drugs and to follow up with the Mental Health Center.  [Tr. 364.]  It is unknown if Trujillo followed up about his drug use or mental health complaints.

### 2003 Medical Records

In December 2003, Trujillo went to the ER complaining of left hip pain after falling from a moving vehicle.  It is not clear from the records but he may have fallen from the hood of a moving car.  There was no evidence of a fracture or dislocation.  [Tr. 353, 354, 359, 361.]

### 2004 Medical Records

In early 2004, Trujillo presented at the ER for pain related to a tooth abscess.  He had jaw pain and swelling.  He was prescribed a pain medication – Vicodin.  [Tr. 329, 330, 333, 337, 342.]

9

On March 29, 2004, Trujillo went to the University Hospital ER again, this time for sciatica. He complained of lower back pain that was radiating and had worsened in the last two weeks. He had lost control of urination. [Tr. 322-24.] An MRI of his left spine indicated there was a simulation of "free fragment" behind the body of L5. The radiologist believed this was a nerve root that was exiting and only "partially enhancing." There was no disc fragment seen. There was a slight disc bulge at L2-3, and epidural fibrosis (scar tissue surrounding the spinal cord) on the left side at L4-5. [Tr. 327, 510-11.]

On April 5, 2004, Trujillo went to ER again for back pain and a herniated disc. He was prescribed Percocet, another pain medication. He was to make an appointment with a primary care physician. He had been taking Vicodin but had stopped taking due to problems with side effects. Trujillo had been continually hurting since he stopped the pain medication and had been suffering sharp pain for two weeks. He sometimes lost strength and fell. [Tr. 317.]

On April 6, 2004, Trujillo was seen by Dr. Ortega at First Choice. Trujillo wanted a referral to Dr. Brown who had operated on his back in the late 1990's. Trujillo told Dr. Ortega that he still did paint and body work on automobiles and still rode a motorcycle but he was no longer in professional racing. He reported having an "achiness" in his back, left leg sciatica and a gradual onset of bladder dysfunction about six months ago. He was taking Percocet and it was reasonably effective. He was observed to periodically switch positions from sitting to standing. Trujillo limped on his left side at first but the limp rapidly "settled down." Dr. Ortega noted "recurrence of disc pathology" and believed that his bladder dysfunction was almost certainly related to disc disease. Trujillo was referred to Urology. [Tr. 177, 496.]

10

In late April 2004, Trujillo was again having trouble with a tooth abscess.  [Tr. 310, 313, 315.]  On April 21, 2004, he saw Dr. Ortega mainly to refill his pain medications.  He recently had had an MRI for recurring disc disease as well as "probable arachnoiditis (new term is epidural fibrosis)."  He had not yet been able to get an appointment to see a spinal specialist at UNM.  [Tr. 174, 494.]

On May 19, 2004, testing of Trujillo's back was done and compared to films of March 29, 2004.  There were multi-level disc disease changes that were worse at L4-5 and L5-S1.  There were mild changes at the lumbar levels above this.  Some loss of disc space was shown.  There was no spondylolisthesis (forward displacement of one vertebra over another).  Mild bilateral sclerotic (hardening) changes to the SI joints were observed that suggested degenerative arthritis.  [Tr. 307.]

On June 18, 2004, Trujillo presented at University Hospital complaining of pain and trouble urinating.  He was taking Percocet and Neurontin.[17]  His back injury and back pain were noted.  [Tr. 301, 302.]  On June 29, 2004, Trujillo started physical therapy but reported he had tried physical therapy before his first surgery without success.  In fact, the therapy then had made his pain worse.  But, he stated he had immediate relief from his symptoms after the first surgery.  He was not hopeful about physical therapy at this time.  He had been using a standard cane for about two weeks because of the feeling that his leg might "give out."  He estimated that his back pain was a "6" out of 10.  Trujillo denied radicular (nerve root) pain but said on almost every day that it was difficult to walk.  Both sitting or standing too long bothered him although the pain medications helped.  He moved slowly and cautiously.  [Tr. 298.] He was not currently working and was on short term disability.  Trujillo reported he was applying for SSI.

---

[17]A medication used to relieve nerve pain.  www.webmd.com

11

Trujillo attended about five sessions of physical therapy.  [Tr. 474.]

He filed his application for SSI and DIB in late June 2004 and on July 1, 2004, although the applications forms are not part of the administrative record.

On July 5, 2004, Trujillo filled out an Adult Function Report in which he stated he was living in a single-wide trailer with his family, including his girlfriend, two sons and one daughter.  He was able to eat, shower, perform light housework, including doing the dishes and laundry, and take care of the two youngest children, ages 6 and 9.  He watched television, took short walks and fed the dogs. [Tr. 74.] He could lift heavy things before but no longer could do that.  He did not sleep well, and it was difficult for him to bend or get in and out of the shower.  He had some problems with personal care and lost track of his medications.  [Tr. 75.]

He was able to do the dishes, laundry, sweep, mop and water the yard on a daily basis.  [Tr. 76.]  He pulled weeks, raked the yard and took out the trash.  He got out of the house two to three times a day.  He could walk and drive but preferred not to go out alone because of sharp pain and side effects of medications.  [Tr. 77.]  Trujillo went shopping three times a week and was able to handle money and finances.  He watched movies with the kids and went swimming with them twice a week.  He sometimes had trouble getting into the pool.  Trujillo still engaged in social activities, including visiting family and talking on the telephone.  He did not attend as many family gatherings due to feeling nervousness and wanting to avoid commotion.  He could lift 20 to 30 pounds but could not squat.  He described a lot of pain with bending.  He could only stand for short times.  He walked but tired easily.  He could not kneel.  [Tr. 79.]  Trujillo was using a cane which he said was prescribed by a doctor eight months ago.  He needed to use the cane when walking and when getting

12

up from a seated position.  [Tr. 88.]  There are no corresponding medical records showing that a cane was prescribed during this time frame.

On July 20, 2004, Trujillo saw Dr. Ortega because his wrist was bothering him.  Spinal disc problems and insomnia were noted.  [Tr. 168, 493.]  An x-ray of his wrist was normal.  [Tr. 296.]

On July 21, 2004, Trujillo was discharged from physical therapy.  The therapist noted that he was somewhat inconsistent in his efforts with exercise and exhibited an inconsistent gait pattern in the clinic.  He complained of extreme fatigue during the day.  He reported he was limping less during his last physical therapy visit but that he had increased back pain with gentle exercises.  He canceled therapy or did not show up for his last three visits.  [Tr. 295.]

On August 11, 2004, Trujillo saw Dr. Christopher Patton, D.O. of New Mexico Spine.  He was referred by Dr. Ortega.  This was a follow-up appointment after Trujillo received L4-5 transforaminal epidural injections on August 3, 2004.  Trujillo reported he had short-term improvement of his symptoms after the injections but not long-term help.  He continued to complain primarily of axial lower back pain and an aching sensation.  Dr. Patton's impression was lumbar spondylosis (degenerative joint disease affecting lumbar vertebrae and inter vertebral discs); epidural fibrosis; status post-lumbar discectomy (excision of a disc).  He was scheduled for facet joint injections at L4-5 and L5-S1.  [Tr. 122, 503.]

On August 12, 2004, Trujillo saw Dr. Ortega and told him that the epidural injections had not helped much.  He was to be seen by orthopedics in a week to discuss epidural injections at different levels.  He felt nauseated with some of his recent medications.  His cervical and thoracic spine x-rays were discussed but not done.  Dr. Ortega thought x-rays might be helpful but he felt they would be normal.  An MRI would be more helpful.  He was diagnosed with chronic pain

syndrome and lower back pain.  Dr. Ortega noted that he would write a letter regarding Trujillo's situation of being disabled in his current trade of paint and auto body work and that Trujillo fully intended to retrain for non-manual labor.  [Tr. 166, 491.]

On August 17, 2004, Trujillo's back and neck were x-rayed.  There was unchanged minimal C5-C6 degenerative disc disease and otherwise, an unremarkable cervical spine.  [Tr. 213.]  There was mild-moderate spondylosis deformans of the mid-cervical and thoracic spine with disc disease changes at C5-6 and multiple levels of the mid-thoracic spine.  [Tr. 292.]

On August 24, 2004, Dr. Eileen Brady filled out a physical RFC Assessment for disability services.  [Tr. 123.]  The primary diagnosis was: status-post lumbar discectomy six years ago; epidural fibrosis L4-5; L2-3 disc bulge; and degenerative disc disease in the cervical and thoracic spine.  She noted that the date of last insured (DLI) was December 2002 and that his onset date of disability was December 31, 1998.  Dr. Brady observed that there was insufficient medical evidence prior to the DLI.  She concluded that Trujillo could lift 20 pounds occasionally and 10 pounds frequently; could sit or stand six hours; and could push and pull, without limitation.  [Tr. 124.]  He alleged lower back pain with two herniated discs and that he had had a return of his back symptoms in 2004, years after his back surgery in the late 90's.  Dr. Brady summarized many of the medical records and testing.  She noted that the repeat MRI of May 2004 did not show much change.  The August 2004 x-rays of the thoracic and cervical spine showed some mild to moderate spondylosis with degenerative disc disease.  [Tr. 124.]  He was not at listing level, and the only evidence available prior to the DLI was a September 2002 ER visit to UNM for an unrelated condition.  She found no manipulative or visual limitations.  [Tr. 126, 127.]  There was insufficient medical evidence from the onset date to the DLI to support the DIB claim.  [Tr. 125.]

14

On September 10, 2004, disability services conducted a face-to-face interview of Trujillo. There were no problems noted.  He was neat and clean, friendly and talkative.  [Tr. 92.]  It appears that disability services contacted Trujillo about notations that he had been prescribed a cane.  He told them that he had not been prescribed a new cane but that "they" said it was all right for him to use the cane he still had from his first surgery seven years ago.  [Tr. 196.]

In his Work History Report, dated September 10, 2004, Trujillo stated he had been in the auto body work business from 1989 to 2003.  [Tr. 110.]

On September 24, 2004, disability services denied his claims of SSI and DIB.  In one explanation of the denial, disability services stated that there was not enough evidence available to make a determination prior to the DLI.  With respect to the claim for SSI, disability services stated that while he could not perform his prior work, he should be able to perform lighter levels of work and was not severely restricted.  [Tr. 63, 399.]

On October 7, 2004, there is an EMS report related to a non-emergency.  The report is not legible.  [Tr. 287-88.]  The ER notes from October 7, 2004 show that Trujillo reported his pain level was an "8" out of 10 and that he had lower back and neck pain.  He also complained of headaches. He was to continue taking Percocet.  [Tr. 287, 288.]

On October 9, 2004, Trujillo presented at the ER complaining of headaches secondary to myofascial pain, lower back pain and degenerative disc disease.  He was given muscle relaxants to use as necessary and instructed on relaxation techniques.  He was given injections of Demerol.[18] [Tr. 285, 290, 291.]  On October 15, 2004, Trujillo was again at the ER complaining of pain.  He

---

[18]Narcotic pain reliever, similar to Morphine, used to treat moderate to severe pain.  www.webmd.com

was taking Naproxen,[19] Neurontin and Percocet.  He also complained that his vision was cloudy. [Tr. 277, 280.]

Trujillo may have spent a night at University Hospital on October 14-15, 2004.  He was treated and released.  He reported chronic back pain, occasional sharp pains and headaches.  A CT of his brain and head was performed to evaluate the complaints of pain.  It was normal.  [Tr. 283.]

On October 20, 2004, Trujillo complained that his headaches were a "10" on a scale of 1-10. The University Hospital records state that they had discussed Trujillo with Dr. Ortega and that Dr. Ortega would begin a "drug contract" with him.  Trujillo was taking Percocet and Bextra.[20] [Tr. 272, 273.]  On October 29, 2004, Trujillo was again at the ER.  He had no Percocet left and complained of chronic back pain.  He was receiving Novacaine injections in his neck.  The medical notes indicate he had been to the UNM Hospital four times in the past 2½ weeks with headaches.  He had an appointment scheduled with orthopedics on November 22.  [Tr. 275.]

On November 4, 2004, Trujillo told Dr. Ortega that he still could not get in to see a neurosurgeon and he was having significant neck muscle spasms.  The Bextra was helping.  [Tr. 473.]

On November 19, 2004, Trujillo filled out an appeal form for the denial of his disability claims.  [Tr. 113.]  He stated his health was worse, including his upper back numbness, his lower back pains, migraines, and numbness in his arms.  X-rays of the neck showed some disc narrowing at C5-6.  He was scheduled to be seen for back surgery.  His first physical therapy appointment was November 2, 2004.  He continued to be treated for shoulder and neck pain.  He received shots of

---

[19]Used to relieve pain and swelling.  Known as a nonsteroidal anti-inflammatory drug ("NSAID"). www.webmd.com

[20]No longer sold in the United States.  www.webmd.com

Demerol to his neck. He had been given Oxycodone[21] for pain and Bextra as a muscle relaxant. He was also given Neurontin for pain and Methocarbamol[22] for muscle spasms. [Tr. 116.] It was difficult for him to dress himself and harder to walk. He was unable to drive some days due to pain and headaches. [Tr. 117.] His memory was also poor; he was unable to work because of back pain. He could not lift over 20 to 25 lbs. without pain. He could not think straight due to neck and head pain. He was sleeping more because of the medications and because his mind wandered. He suffered from blurred vision. [Tr. 118.] The cortisone injections in his back did not help. [Tr. 119.]

On November 23, 2004, in his Request for Reconsideration, Trujillo wrote that his lower back condition was worse and that he had new problems with his neck and also, migraine headaches. [Tr. 61.]

There are notes from the physical therapist, dated December 6, 2004. The diagnosis was cervical pain. He was seen by a physical therapist from November 12, 2004 to December 6, 2004. There was slight improvement in some of his range of motion but the pain was not really improved after five sessions. Trujillo had canceled some therapy appointments and had not shown up for others. [Tr. 131-36.]

On December 10, 2004, Trujillo was seen by Dr. Huberty in orthopedics for his lower back pain. [Tr. 267.] The record indicates that seven years ago, Dr. Brown performed a L5-S1 decompression and that Trujillo reported a fusion as well. He did remarkably well for six years after the surgery until last February (2004) when his lower back pain returned. He felt "shooting pain" on occasion. He had had two steroid injections without success. The pain was "excruciating." He

---

[21]Narcotic pain reliever.  www.webmd.com

[22]Muscle relaxant.  www.webmd.com

had to quite his job as a car body painter and mechanic.  The NSAIDs and therapy did not help.  He

was observed to walk with a steady gait.  He used a cane for support.  There was no real limp but

he appeared uncomfortable when upright.  He felt pain when seated.  The MRI from 2004 showed

degenerative disc disease at L3-L4 all the way down to L5-S1 and some mild disc herniations at

those levels.  [Tr. 267.]  There was no evidence of a previous fusion.  At this point, Trujillo had

exhausted conservative treatment and his symptoms were severe.  "He would like and is adamant

about surgery."  The plan was to do an L4-L5, L5-S1 bilateral decompression and fusion with

instrumentation and post-iliac crest bone graft.  [Tr. 267.]

### 2005 Medical Records

On  January 5, 2005, Trujillo had an MRI of lumbar spine done for his lower back pain and

left leg pain.  There were no significant abnormalities of the marrow.  The report indicates a fairly

anteriorly angulated distal coccyx.  The distal spinal cord and conus were normal in position.  The

nerve roots were somewhat clumped at L4-5 and L5-S1.  There was moderate to mildly severe loss

of disc space at L2-3.  There was also a disc bulge there.  At L3-L4, there was mild to moderate loss

of disc space height and signal and a generalized disc bulge with no direct nerve impingement.

There not any significant spinal stenosis.  At L4-L5, the report noted an area of low to intermediate

signal along the left anterolateral aspect of thecal sac or a small disc protrusion. [Tr. 159.]  There

was a mild diffuse disc bulge.  At L5-S1, moderate diffuse loss of disc space height and signal were

noted, along with a diffuse disc bulge.  The conclusion was "diffuse multilevel degenerative disc

disease."  The area of  most significant abnormality was at L4-5.  [Tr. 159, 487.]

An MRI of the cervical spine for posterior neck pain and bilateral arm and hand numbness

was also performed on January 5.  [Tr. 161.]  The MRI showed some moderate loss of disc space

height and signal in some areas with a mildly diffuse disc bulge at C5-C6.   No significant spinal stenosis was observed at that level.   The degenerative changes were predominantly seen at C5-C6 and C6-C7.   There was not significant spinal or forminal stenosis.   [Tr. 161.]

On January 7, 2005, Trujillo was seen by Dr. Marshall in orthopedics.   The record notes that he was now "7 years post L5-S1 decompression by Dr. Brown."   [Tr. 259.]   Trujillo had had good relief from that operation but over the past several years had started to feel more pressure and pain. The pain was shooting down the posterior aspect of his left buttock, and the symptoms had worsened in the last year.   Trujillo was unable to work as a car body painter.   He had failed treatments with NSAIDS and epidurals.   He was walking with a cane.   Without the use of a cane, he had a steady but antalgic (avoidance of pain) gait.   He could heel-toe walk normally.   The x-rays showed degenerative disc disease from  L3 to S1, but the MRI did not show any major stenosis.   Trujillo would likely benefit from "just a lumbar spine fusion."   [Tr. 259.]

Trujillo was admitted for the surgery on January 18, 2005 and discharged on January 20th. [Tr. 140.]   Dr. Raducan performed the operation.   The record again noted that Trujillo had failed conservative treatment, including physical therapy, and NSAIDs.   He requested further back surgery. Trujillo was seen and evaluated by the orthopedic department, and it was determined he would have another surgery.   He was taken for lumbar stenosis and radiculopathy for a lumbar decompression posterior spinal fusion with instrumentation and iliac crest bone graft L4 to S1.   He did extremely well with physical therapy and was walking up and back without a brace.   However, he was discharged with a TLSO brace.   [Tr. 140-43.]   Pain control had been an issue and he was discharged with plenty of pain medications.   A posterior spinal fusion to L4-S1 was performed.   Before surgery,

Trujillo was "made especially aware as to higher likelihood of failure to relieve symptoms despite a technically correct surgery without complications." [Tr. 143, 499.]

On January 18, 2005, Trujillo was seen ten days after the fusion. He was doing much better and had no lower extremity symptoms. His back pain was better, but it was still too early to say according to Dr. Raducan. The x-rays that day were ok. [Tr. 256.]

On February 10, 2005, Dr. Ortega saw Trujillo. The home oxygen company advised that Trujillo had some problems with desaturation. Dr. Ortega noted that Trujillo recently had a lumbar fusion with placement of an indwelling screw and rod fixation hardware. Trujillo was very encouraged after the surgery as he needed less pain medications than before surgery. He had some bronchitis before the surgery and might be suffering from seasonal asthma. [Tr. 155, 482.]

On March 3, 2005, Dr. Ortega again saw Trujillo for a follow-up from a visit Trujillo made to the ER. He had gone to the ER because of chest pains and exertional dyspnea (labored breathing) with walking which had worsened after the back surgery. He was wearing his brace but the pain was a bit worse with the brace in place. There was no cardiac event. He probably suffered from dyspnea at rest because of deconditioning and his post-op status. [Tr. 153, 479.]

Dr. Raducan saw Trujillo on March 4, 2005, six weeks after the fusion. His radicular symptoms and lower back pain were improved. He typically wore his TLSO brace and was to wear it for three months. He was able to walk that day and was not actually wearing his brace. The x-rays showed good alignment. He was to be seen in six weeks.

On April 4, 2005, Trujillo was seen by Cardiac Care Consultants for a stress test due to an onset of severe shortness of breath and chest soreness. The stress test was mildly positive.

Continued medical management was recommended, along with enrollment in an exercise program for physical conditioning.  [Tr. 180.]

On April 12, 2005, Dr. Ortega saw Trujillo as a follow-up for his respiratory problems. Trujillo mentioned that he had had allergies for years and used to get one to three shots of Kenalog for years.  He needed a refill of the Percocet on this day.  Dr. Ortega explained that the stress test results were essentially normal.  [Tr. 470.]

On May 10, 2005, a physical RFC assessment was conducted.  The primary diagnosis was: failed laminectomy syndrome (excision of posterior arch of a vertebrae), status-post lumbar fusion. [Tr. 185.] Trujillo could lift 20 pounds occasionally and 10 pounds frequently. He could sit or stand for six hours.  He was using a cane for support and had undergone surgery on January 18.  He was walking without difficulty.  Trujillo had negative cardiac testing related to chest discomfort. Durationally, it was expected he would improve  by July 1, 2004, one year from the filing date of his benefits application.  He had occasional postural limitations of climbing, stooping, and crouching. He could not crawl.  He could balance and kneel.  He was to avoid exposure to extreme cold and hazards with machinery.  [Tr. 185-89.]

On May 11, 2005, Trujillo's request for reconsideration of the initial denial of benefits was denied.  [Tr. 49.]  In the explanation, it was noted that based on the evidence, there was insufficient evidence available to evaluate his level of functioning prior to his DLI of December 2002.  By July 2005, it was expected that he could perform light level work although he would not be able to return to his PRW as it required crawling.  At step 5 of the sequential evaluation, it was suggested that he would be found not disabled.  [Tr. 50, 395.]

On June 14, 2005, Trujillo was seen by Dr. Ortega.  [Tr. 467.]  He was frustrated because he had gone to a private neurosurgeon and the surgeon had not received a copy of the MRI of his cervical spine.  [Tr. 467.]  He had hoped to get some attention for his neck problems which were similar to his lumbar spine issues.  He was frustrated with the lack of coordination between UNM and the private medical system.  Dr. Ortega felt that while the results of his C-spinal MRI were not normal, it was unlikely that anyone would recommend surgery.  The wisest course of action, according to Dr. Ortega would be to do physical therapy for the neck.  Dr. Ortega changed Trujillo's pain medication from Percocet to Oxycodone.

On June 27, 2005, Trujillo filed a request for ALJ hearing and stated he was totally disabled and unable to work.  [Tr. 245.]

On the same date, he presented at ER for lower back pain.  He stated that the Oxycodone was not helping and that he had fallen three days ago.  [Tr. 245.]  He fell over a box when his legs "went out."  He complained of pain at the site of his back surgery and on his buttocks.  He was prescribed Dilandid[23] and discharged.  [Tr. 245-49.]  An x-ray of the pelvic area and lumbar spine did not show a fracture or dislocation.  The spinal fusion hardware was visible but there was no identifiable complication or loosening of the hardware.  [Tr. 241.]

On July 6, 2005, Trujillo was seen by orthopedic doctors.  He stated that he had fallen two weeks ago from a standing position.  He felt pain over the tailbone and right buttock.  He exhibited a normal gait and strength.  The two views of the lumbar spine showed good alignment.  The doctors ordered an MRI.  [Tr. 237, 239, 433.]

---

[23]Narcotic pain reliever.  www.webmd.com

On July 21, 2005, Trujillo had an MRI, but it was difficult to view the area in question because of the hardware in place. There was a small disc protrusion causing slight narrowing at L2-L3. [Tr. 235-36.]

On July 28, 2005, a medical progress note indicates Trujillo had fallen a month ago. "Lawyer disability" is also written on the note. He felt chronic pain. [Tr. 466.]

On August 17, 2005, Dr. Conrad, an orthopedic specialist, saw Trujillo, who claimed not to have had significant relief post surgery. His legs had given out several times. He had fallen several weeks earlier and two days before this appointment. An MRI of his spine was ordered and reviewed, but it was difficult to evaluate due to the hardware in place. No compression of the spinal cord was visible. The doctor ordered a CT myelogram to further assess the spine for stenosis or radicular compression. The EMG study of the bilateral lower extremities would be used to evaluate any neurologic deficits. [Tr. 233.]

On August 25, 2005, Trujillo had a barium swallow test for dysphagia (trouble swallowing). Normal swallowing was indicated. He had a hiatal hernia with widely patent gastroesophageal junction with reflux. The radiologist suggested that an endoscopy might be helpful. [Tr. 232, 431.]

On August 26, 2005, the progress notes indicate a diagnosis of GERD and that a CT myelogram had been ordered.

On an undated disability report, filled out by Trujillo and date-stamped September 6, 2005 (by the Office of Hearings and Appeals), Trujillo stated there was a slight disc bulge in his back and a "free fragment" around L5. [Tr. 93.] He was experiencing a lot of intense pain and the loss of use of his left leg. The medications he was prescribed were causing memory loss. He was first bothered by pain on January 15, 2004 and unable to work as of February 6, 2004. [Tr. 94.] Trujillo explained

that he had had to work fewer hours and change work duties at some point, but he no longer worked as of February 6, 2004.  [Tr. 94.]  He stopped working because of "severe pain.  He was taking Neurontin and Percocet for his lower back pain.  [Tr. 99.]  Here, he stated that he had completed high school [Tr. 100], but that turned out to be untrue based on information he gave a psychiatrist in 2007.  Trujillo claimed to have worked in the auto business and auto body work from 1989-2003. [Tr. 104.]  In another disability report, perhaps dated September 10, 2004 or just printed on that date by disability services, Trujillo stated he was unable to work as of December 31, 1998, but that he had attempted to work in 2003 for several months but had to stop due to his "disabling condition." [Tr. 104.]

On September 8, 2005, Trujillo had an EMG done to evaluate his lower extremity pain and weakness.  Trujillo stated that he had been injured in a motorcycle accident "twenty years ago" but had done well until eight years ago when he had pain in his back and left leg, and eventually had surgery.  [Tr. 229.]  In 2005, the record notes that he had a fusion of the lumbosacral spine, but that he still felt pain in his back, buttocks and legs.  His legs gave out at times causing him to fall.  The physician did not find any weakness or atrophy in the muscles of Trujillo's lower extremities.  The EMG exam was carried out, but there was no sign of lumbosacral nerve root dysfunction, either clinically or electrically.  The physician did not know what was causing the problem.  [Tr. 229, 429.]

On September 13, 2005, Trujillo again began physical therapy.  The potential for rehabilitation according to the therapist was "good."  [Tr. 506.]  On September 29, 2005, Trujillo was seen by a Physician's Assistant with a neurosurgeon's practice.  P.A. Potter noted Trujillo's significant lumbar spinal history, including the fusion in January 2005.  The current problem with Trujillo's neck started in February 2004. [Tr. 507.]  His hands were swollen and his arms felt

"heavy."  He was referred to Dr. Metzger.  [Tr. 508.]  On the medical record, the P.A. stated that Trujillo was "disabled."  [Tr. 507.]

On October 20, 2005, Trujillo had a lumbosacral spine myelogram.  There was no evidence of "contrast block identified at any level."  [Tr. 221.]  There was moderate spinal stenosis at L2-L3 secondary to a disc bulge and mild spinal stenosis at L3-L4, secondary to mild retrolisthesis of L3 on L4 and a mild broad-based disc bulge.  There was no evidence of a disc bulge or spinal stenosis at L4-L5 or L5-S1.  [Tr. 223.]

On November 8, 2005, Dr. Metzger, a neurosurgeon, examined Trujillo, who complained of neck and right shoulder pain.  There was not any radiation of the pain down his arms, but he complained of some numbness in his hands bilaterally.  Dr. Metzger reviewed the MRI done in January 2005, which indicated mild degenerative disc disease at C5-C6, C6-C7.  There was a compromise at the right C5-C6 neural foramen, but no significant neural compression in the cervical spine.  The canal was mildly narrowed at C5-C6 due to the disc bulge.  Dr. Metzger did not think that surgery was in Trujillo's best interest at this time.  The pain in Trujillo's neck sounded more like a muscle spasm than radiculopathy, and his hand numbness most likely was the result of carpal tunnel syndrome.  Dr. Metzger noted that Trujillo appeared relieved to hear that he was not suggesting surgery.  [Tr. 504-05.]

On November 9, 2005, just a day later, Trujillo presented at the ER with complaints of back and neck pain.  He was taking Oxycodone and Ibuprofen (2400 mg/day).  He rated his pain as a "10" on a scale of 1-10.  The acute pain had started in the last two days.  He felt his legs were weak and he fell when he walked.  [Tr. 217, 424.]

On December 13, 2005, Dr. Ortega saw Trujillo who came in for refills on his pain medications.  He was taking Percocet.  He also brought Dr. Ortega some social security forms that he wanted help in filling out.  Dr. Ortega said that Trujillo needed to get a work evaluation to accurately determine his lifting restrictions.  Thus, any restrictions that Dr. Ortega found were based on the interview with Trujillo and Trujillo's subjective statements.  [Tr. 459.]

On December 15, 2005, Dr. Tripuraneni saw Trujillo.  [Tr. 211.]  Since the spinal fusion that was performed by on January 18, 2005, Trujillo felt weakness in bilateral lower extremities and had fallen six times, none of which caused serious injury.  His primary complaint on this day was neck pain with decreased flexion and extension.  Trujillo had difficulties sleeping because of the neck pain.  His bilateral upper extremities were "clumsy," but he did not feel numbness or tingling.  It was determined that Trujillo would need x-rays and an MRI.  [Tr. 211.]

On December 16, 2005, Dr. Ortega filled out a Medical Source Statement of Trujillo's Ability to do Work-Related Activities.  [Tr. 197.]  Dr. Ortega limited Trujillo in his ability to work for longer than 12 months; he was not to lift more than 10 pounds because of neck and back pain; his standing and walking were limited due to normal occasional limp; he could sit or stand for less than two hours due to neck and back pain.  He used a hand-held assistive device so that he could ambulate for 1-2 hours.  All functions were limited due to neck neuropathy and back pain.  Dr. Ortega again emphasized: "All of the above answers about function [are] completely based on interview, not exam, except gait."  [Tr. 198.]

**2006 Medical Records**

On January 6, 2006, Trujillo had an MRI of his cervical spine.  [Tr. 209.]  There was a shallow disc protrusion at C5-C6 which could impinge on the anterior surface of the spinal cord. There was probable mild right neural foraminal narrowing at the same level.  [Tr. 209.]

On January 18, 2006, Dr. Tripuraneni examined Trujillo, noting he was last seen in that clinic on December 7, 2005, when he recommended that Trujillo obtain a cervical spine MRI to explore the neck pain and clumsiness he was having with his bilateral upper extremities.  Trujillo complained of needing to use thicker pens to write in order to control his writing.  He suffered from lower back pain with right buttock pain without radiation.  He had a CT myelogram performed earlier which did not show any "filling defects of L-spine."  The EMG of his bilateral lower extremities was within a normal range.  The symptoms had not changed since his last visit.  His complaints of numbness along with pain in his right buttock and right leg continued.  No weakness was noted. The MRI of the spine demonstrated C5-C6 herniated nucleus pulposus with a very small extrusion of the disc at C6-C7.  Dr. Tripuraneni stated there was nothing to offer him operatively. Trujillo should use anti-inflammatories for his lower back and neck pain and follow up in six months.  [Tr. 205.]

On March 8, 2006, Trujillo's earlier attorney wrote to the hearing officer, noting that he was providing additional medical records for review along with Dr. Ortega's statement of Trujillo's ability to work.  His attorney reiterated that the pain in Trujillo's back had recurred in 2004.  [Tr. 120.]

There is an undated part of a work background form that must have been filled out in 2006 since it refers to 2006 medical treatment.  [Tr. 376.]  In 1983-1988, Trujillo was a mechanic on

27

imported cars at a foreign parts business.  In 1988-90, he was a Kenworth handyman.  In 1990 to 1994, he did body and collision work.  From 1994 to 1996, he was a mechanic.  This form states that Trujillo was getting assistance from welfare from 1997-99.  He performed body and collision work from 1999-2000, and was self-employed from 2000-2003.   In 2003-2006, he was "getting assistance."  Trujillo had seen Dr. Reyna on July 5, 2006.  He still reported ongoing back and neck pain, many headaches, vision problems and floating spots in his eyes.  This form also listed a number of the medications Trujillo was taking.  [Tr. 376-79.]

On July 5, 2006, Trujillo was seen in Dr. Reyna's office.  He complained of neck pain that was increasing and radicular symptoms over his left upper extremity that was not well controlled with the current medications.  He also had some tenderness in his left buttock area.  The doctor discussed with him that his cervical degenerative changes were stable and non-operative at this time. He was to follow up in six months.  [Tr. 380.]

On July 5, 2006, Dr. Paul Echols with UNM Ortho Spine filled out a Medical Source Statement of Trujillo's Ability to Do Work-Related Activities.  [Tr. 381.]  This form was provided to Dr. Echols by Trujillo's earlier attorney.  [Tr. 381.]  It is not clear whether Dr. Echols treated Trujillo or personally examined him.  Dr. Echols, however, limited Trujillo's ability to work for more than six months.  Trujillo could lift up to 10 pounds often based on his status-post lumbar fusion and cervical disc degeneration.  There were no limitations on walking or standing.  [Tr. 381.] He could stand or walk up to two hours a day because of his status-post lumbar fusion surgery. There were no limitations in Trujillo's ability to sit.  He also was not limited in his abilities or reaching, handling, traveling, speaking, hearing, fine manipulation with fingers.  [Tr. 382.]

On July 19, 2006, the ALJ hearing was held.  Trujillo was represented by his earlier attorney.  The ALJ first addressed the problem with Trujillo's Title II or DIB claim because there was no medical evidence to support the claim.  The only medical evidence related to the time frame of 2002-06, and Trujillo had identified an onset date of December 1998, and it was clear that his LDI was December 2002.  The ALJ asked counsel if Trujillo was amending his application as to the SSI benefits only or if there was evidence that supported a DIB claim.  [Tr. 517.]  Counsel stated that he had discussed this problem with Trujillo "in detail" regarding the onset date and the lack of medical evidence that existed before the DLI.  [Tr. 518.]  He advised his client that it would be difficult to proceed with the DIB claim, based on the onset date and the DLI.  Counsel told the ALJ that he believed the claim for SSI was the primary claim to proceed for this reason although he did not have permission from his client to withdraw the DIB claim.  [Tr. 518.]

The ALJ observed that Trujillo's disability onset date was 1998.  Counsel confirmed that this was the stated onset date but that it was clear Trujillo had worked since 1998.  Moreover, his client was not sure why he had chosen the 1998 onset date.  [Tr. 519.]  Counsel stated that the medical records indicated that after the first surgery in the late 1990's, Trujillo first complained of back problems in March 2004 when he went to the ER.  According to counsel, the true onset date for the SSI application was March 4, 2004.  [Tr. 519.]  Trujillo did not add anything to the discussion regarding onset date, DLI, or the DIB claim and lack of evidence to support it.

Trujillo testified that he graduated from high school [Tr. 520] and received some job training.  [Tr. 523.]  He last worked in auto body work and auto painting four years ago.  [Tr. 523-24.]  He had to quit that work in 2002 because his back problems.  [Tr. 524.]  He further testified that he had gone to the ER in March 2004 because of back pain and his left leg "giving out."  [Tr. 524.]  He was

29

not working in 2002-04 but he was leasing space from a friend and doing some auto work on his

own when he got it during this time frame.  [Tr. 525.]  He had back surgery in 1997 and "more or

less" returned to work full-time after the surgery.  [Tr. 526.]

When asked what his number 1, biggest physical problem was, Trujillo testified that it was

now is neck pain and headaches.  [Tr. 526.]  His headaches created vision problems.  [Tr. 527.]

Trujillo still had back pain and problems with his left leg.  He could not bend well or carry items far.

He could only lift 10-12 pounds and stand for up to 20 minutes.  [Tr. 527, 528.]  Trujillo could sit

for 20 minutes.  [Tr. 529.]  He had the same problems sleeping.  He could not remain in one place

for long.  He had to get up from bed and sleep in a chair for awhile.  [Tr. 529.]  If he walked, he felt

pressure in his lower back.  [Tr. 529.]  However, he could walk for 45 minutes.  He helped out in

the house, did chores and made dinners.  [Tr. 530.]  He was able to take his kids to the pool or

fishing; he also attended church with them.  [Tr. 531.]

Trujillo's attorney asked some questions at this point in the hearing.  Trujillo testified that

he had a short temper now due to the pain he felt and was depressed over his situation.  He did not

see people as much.  He cleaned house for 1 to 1½ hours.  He could not bend to put on or tie shoes

without help from his children.  [Tr. 534.]  He could not lift 10-20 pounds continuously.  [Tr. 535.]

When asked again about his "number 1 problem," he reiterated that it was neck pain and headaches

although he still had lower back pain.  [Tr. 535.]  He rated his headache pain at an 8 or 9 out of 10.

The headaches sometimes lasted for days.  His neck pain was a 10.  He tended to get disoriented and

he also lacked concentration.  [Tr. 536.]

The ALJ asked if the medical records documented his complaints about headaches.  Counsel

stated that there were references to headaches in some of the records.  Trujillo complained of trouble

concentrating and memory problems.  [Tr. 541.]  The medications helped with his pain.  He was able to sleep four hours with medications.  The VE then was asked for her testimony and given several hypotheticals based on Trujillo's limitations.  The VE ultimately testified, based on the limitations presented, that Trujillo would be able to perform the position of a surveillance system monitor.  [Tr. 548.]

Counsel for Trujillo gave another hypothetical to the VE, with more restrictions, at which point the VE did not think Trujillo could perform the job.  However, the ALJ noted that in 2006, Dr. Echols had not limited Trujillo's ability to sit or stand contrary to Trujillo's attorney's hypothetical to the VE.  [Tr. 549.]

On September 14, 2006, Trujillo had a chest x-ray but it was normal for his age.  On December 20, 2006, he complained of lower back pain and poor sleep.  An MRI was scheduled.  [Tr. 462.]

### 2007 Records

On February 23, 2007, the ALJ issued an unfavorable decision on Trujillo's applications for benefits.  He concluded, in part, that the DIB claim was rejected due to an amended onset date of March 4, 2004.  [Tr. 27.]  Trujillo did not prove a disability prior to or on the date of the DLI; thus, the DIB claim could not proceed.  The ALJ amended the onset of disability for the SSI claim to March 4, 2004.  The ALJ proceeded to review the medical records, ultimately finding that there was no disability.  [Tr. 36.]

On March 30, 2007, Trujillo, through new counsel, appealed the ALJ decision.  [Tr. 19.] Trujillo provided additional evidence on his appeal, including his own statement along with statements by his father-in-law and his significant other.  [Tr. 418, 420, 421.]  The statements were

31

typed and clearly prepared by counsel since some of the statements contain identical language. Trujillo's father-in-law, Jimmy Martinez, stated that Trujillo needed help making appointments due to his poor memory, which might be related to "regular pain." He was depressed and staying in the house for 2 to 3 days at a time. Martinez observed Trujillo to be in pain regularly. He had trouble sleeping and had to sleep in a recliner. Martinez, like Trujillo and the significant other, believed that Trujillo last worked in 2003 for about six weeks. [Tr. 418.]

Trujillo's significant other, Keri Knapic, stated that she was separated from Trujillo after a 13-year relationship because of his labile emotions, unpredictable behavior and anger control problems. Knapic was employed as a cook at Capos. She and Trujillo had two children in common, ages 12 and 9. They had lived together so she knew his physical and mental impairments. Trujillo did not do well, and Knapic had to support him financially. Trujillo had had memory problems since the 1996 surgery. He could not drive and had regular pain. [Tr. 421.]

Trujillo stated that he was physically and mentally disabled due to neck and back pain. He also suffered from mental problems including anxiety and depression. He never understood that he was amending the onset date of his claim when he was before the ALJ. He claimed that his earlier attorney did not explain what was happening with respect to the amendment of the onset date. [Tr. 420.]

On June 29, 2007, Dr. Clifford Morgan provided a psychological and vocational evaluation apparently at the request of Trujillo's counsel. [Tr. 404.] Trujillo reported that he was disabled from working because of neck and low back problems, chronic pain, anxiety and depression. He last worked for six weeks in 2003 at an auto body shop. He worked part-time then but was unable to meet the physical and mental demands of the job. His previous sustained employment occurred

before 1998.  He had not been able to work consistently since 1998.  He had no income and depended on his mother and step-father.  He lived in his parents' garage apartment.  His 12-year old son lived with him, but his nine-year old daughter lived with her mother.  He had been living with his parents since January 2007.

Trujillo told Dr. Morgan that he was seeing Dr. Reyna in two weeks and a specialist at an asthma clinic.  He was receiving physical therapy two times a week at UNM although there are no corresponding records.  He was taking 800 mg. of Ibuprofen, Trazadone, Valium, Albuterol, Flovent, Percocet 4 times a day, MS-Contin, and Cymbalta.  He had a driver's license but received a DWI citation six weeks ago.  He had a court date of August 18, 2007.  He had a previous DWI 12 years ago.  He no longer likes to drive because of seeing spots in his eyes.  [Tr. 404-05.]

He began the 12th grade in California but dropped out and did not get a G.E.D.  [Tr. 406.] He never attempted to get his G.E.D. but he received some job training related to auto body work. His medical problems first began after drag racing on a motorcycle at the age of 25 or 26.  [Tr. 407.] His first back surgery was in 1996 which helped him but he later had back problems again and a spinal fusion in 2005.  The second surgery did not relieve his pain.  [Tr. 407.]

Dr. Morgan had Trujillo's medical records and summarized them in his report.  Trujillo had denied mental health counseling or care but was taking Cymbalta per his primary care physician. Trujillo was never diagnosed with substance abuse, but Dr. Morgan noted his DWI arrests and the 2002 report of amphetamine use.  While Trujillo told Dr. Morgan that he usually did not drink, he admitted that alcohol cause problems in his relationship.

Dr. Morgan recounted Trujillo's work history but stated that a complete history of employment was not available because of Trujillo's memory problems.  When Trujillo filled out

33

forms at Dr. Morgan's office, he was unable to remember his correct age on one form.  [Tr. 410.]
He appeared somewhat unshaven and disheveled.  He was wearing a brace on his left ankle that he
said he fractured one month ago.  He had been going down a handicap ramp when his ankle snapped.
Trujillo also had 24 stitches in his hand on this date and was bandaged from when he accidentally
pushed his hand through a window.

Dr. Morgan observed that Trujillo was cooperative but became fatigued during the interview.
His speech was slightly slurred perhaps due to medication.  His cognitive difficulties were confirmed
by testing conducted by Dr. Morgan.  He read at a fifth grade level.  He had a mild to moderate
cognitive impairment.  [Tr. 410.]  Dr. Morgan believed that his major depression and chronic pain
could impact his current thinking.  His intelligence was within a borderline range and his academic
level was at an elementary level.  Testing revealed that Trujillo had a learning disability even though
he was never placed in special education.  Dr. Morgan did not believe Trujillo could obtain a G.E.D.
if he tried at this time.  He met the criteria for Major Depressive Disorder.  His anxiety appeared
worse than the depression.  He was referred to mental health counseling for anxiety, depression and
chronic pain counseling.  [Tr. 413.]  He was assigned a GAF of 55.

Dr. Morgan also filled out a Medical Assessment of Trujillo's Ability to do Work-Related
Activities (mental).  [Tr. 415.]  He concluded that Trujillo had moderate and marked limitations in
abilities to understand and remember very short and simple instructions and in detailed instructions.
The testing conducted by Dr. Morgan supported this finding.  Trujillo had marked limitations in his
abilities to carry out detailed instructions, maintain attention and concentration for extended times
and to complete a normal work day.  He was also given a number of moderate limitations, all based
on Dr. Morgan's interview, evaluation and testing.  [Tr. 415.]  With respect to social interactions,

Trujillo was given slight and moderate limitations.  [Tr. 416.]  It appears that Dr. Morgan thought Trujillo met Listing 12.04 (affective disorders).  [Tr. 417.]  This later information that was not before the ALJ, was provided to the Appeals Council, which denied the request for review.  [Tr. 8, 12.]

## V.  DISCUSSION

Trujillo argues the case should be remanded because the ALJ violated his right to due process in failing to hold a full and fair hearing on the issue of his DIB application; the ALJ failed to develop the record prior to December 31, 2002 and determine Trujillo's onset date in accordance with regulations; the medical evidence supports a finding that he was disabled and entitled to SSI; the ALJ's step-5 findings were not supported by substantial evidence because the VE's testimony was inconsistent with the Dictionary of Occupational Titles ("DOT"); and the Appeals Council failed to consider the lay witness statements it accepted in accordance with the pertinent regulations and case law.  [Doc. 12.]

The Commissioner argues that the ALJ used proper legal standards in his decision and that there is substantial evidence to support his findings that Trujillo was not disabled during the relevant review period.  [Doc. 15.]

## 1.    DIB CLAIM; ONSET DATE; DEVELOPMENT OF THE RECORD

Trujillo argues that the ALJ violated his right to due process in failing to hold a full and fair hearing in the issue of Trujillo's Title II (DIB) application covering the period on or before December 31, 2002, which is the late he was last insured (DLI).  Trujillo asserts that it was error for the ALJ to *infer* that Trujillo's attorney (at the ALJ hearing) amended his client's alleged onset date to a date after December 31, 2002, and that Trujillo "never voiced any intention to amend the onset

35

whatsoever." [Doc. 16.] "This illegal amendment [by the ALJ] amounted to a quasi-withdrawal of claimant's Title II claim and resulted in claimant's entitlement to these benefits not being heard or adjudicated by the ALJ." [Doc. 12, p. 14.]

Trujillo also contends that the ALJ never took any steps to develop the record regarding Trujillo's impairments or limitations for the period on or prior to December 31, 2002, the date he was last insured. Finally, in his reply brief, Trujillo identifies a social security regulation that requires any withdrawal of a benefits application to be made in writing. [Doc. 16, p. 2.]

> An application may be withdrawn before we make a determination on it if – A written request for withdrawal is filed at a place described in § 404.614 by the claimant or a person who may sign an application for the claimant under § 404.612.

20 C.F.R.. § 404.640(a)(1). Trujillo did not file such a request in writing, nor did his attorney.

At the beginning of the ALJ hearing, the following exchange took place between the ALJ and Trujillo's first attorney. Trujillo was present but had not started to testify.

ALJ:     As you know, a primary issue raised in the prior denial of the Title II [DIB] claim was the lack of medical evidence of onset period to the date of last insured. So, I wanted to present that issue to you to see whether you have any comments or a theory on that issue prior to beginning this hearing or whether you're amending this to a Title XVI [SSI] claim only. But I wanted to present that to you to let, let you tell me where, where your theory is on that issue.

ATTY:    . . . You're exactly correct, Your Honor, and I have discussed this matter in detail with Mr. Trujillo that the onset date is a significant problem because of the lack of medical evidence that is available in the record and that he has been unable to provide me regarding the onset date. I'm sorry – not the onset date – the date of last insured. And that – I've advised him that, based upon the documents that I've reviewed, I, I think it would be very difficult for him to proceed with the Title II application with the onset date [sic] in 2002 due to the lack of medical evidence that he's been able to provide. It is my . . . sense . . . that this claim is primarily a Title XVI claim for that very reason. I, I don't have permission from Mr. Trujillo to withdraw his

Title II application, but he well understands the difficulty in . . . proceeding with that claim.

ALJ:        Okay. I understand and that is certainly Mr. Trujillo's right, but I do appreciate your comments, counsel, because as I said, I think that we all understand where the problems are with that particular part of the claim.

ATTY:       Yes, sir.

ALJ:        And the alleged onset date that I have reflected is December 31st of 1998. Is that correct?

ATTY:       That's correct. That's what he put in the Social Security application. However, as the testimony is going to proceed . . . he has worked since 1998 and I, I have asked him why he chose that date and he has no recollection.

ALJ:        Well, I certainly don't want to suggest anything, but if, between the two of you, you believe there's a more accurate date or more supportable date, I would certainly permit to make any amendments that you chose to make.

ATTY:       I, I've discussed this with my client . . . and he clearly – as the evidence is going [sic] show – he clearly worked through 2003. He was . . . self employed . . . as a body man and mechanic through that date. And the medical records suggest that in March of 2004 is when he went to the emergency room and first began complaining about his, his back. . . . . [E]ssentially he had a, a back surgery in 1997 – is what the evidence is going to show – he went back to work, was gainfully employed for many years and then, essentially due to his particular occupation, it got worse and worse and worse. He ends up back with the doctors starting in March of '04 and ultimately resulted in a, a surgery in January of '05 – a second back surgery. It would be my, my sense Your Honor that the true onset date in this case is going to be that March 4, 2004 visit for – to the UNM doctors for the S– SSI Title XVI application.

ALJ:        Okay. I appreciate that.

[Tr. 517-520.]

37

In the ALJ's written decision denying benefits, he noted that Trujillo filed applications for SSI and DIB and that Trujillo had initially alleged a disability onset of December 31, 1998.

> However, at the hearing, the claimant, by and through his attorney, amended his onset date of disability to March 4, 2004. It was noted that, on this date, the claimant had sought medical treatment at the "University of New Mexico Medical Center" in Albuquerque, New Mexico for his back problems (See, testimony).

[Tr. 26.]  The ALJ further wrote:

> The claimant's earnings record shows that the claimant has acquired sufficient quarters of coverage to remain insured through December 31, 2002. The Regulations provide that the claimant must establish disability on or before that date in order to be entitled to Title II Benefits. However, as noted herein, the claimant's attorney amended his client's alleged onset date of disability to March 4, 2004. Having reviewed the record evidence, I reasonably infer that the attorney amended his client's alleged onset date given the paucity of medical evidence prior to December 31, 2002, and his client's work activity after December 31, 2002 (See, testimony).
>
> Hence, I find that the claimant did not meet his burden of proving that he was under a disability prior to December 31, 2002, his DLI under Title II of the Act.

[Tr. 27.]

The Court disagrees that the ALJ committed error by inferring a later onset date for the Title II/DIB claim. It is true that Trujillo's attorney at the hearing stated he did not have his client's permission to withdraw the DIB claim. However, Trujillo's attorney, speaking on behalf of his client amended the onset date as to the SSI claim without any objection by Trujillo who was present. In so doing, the attorney specifically stated that he had discussed with his client "in detail" the problem concerning the DIB claim and the DLI and that his client had not been able to provide any medical evidence showing physical limitations before the DLI. The attorney further explained that the evidence would demonstrate that his client did not know why he selected an onset date of

38

December 1998, had returned to work after the onset date, had worked after the DLI, and had not gone in for medical treatment regarding a recurrence of back problems until March 4, 2004. *See* Washington v. Shalala, 37 F.3d 1437, 1440 n.2 (10th Cir. 1994) (to be eligible for DIB, a claimant must prove that they were disabled prior to the expiration date of their last insured status); Henrie v. United States Dep't of Health and Human Servs., 13 F.3d 359, 360 (10th Cir. 1993) (same).

Counsel's representations at the ALJ hearing were borne out by the medical evidence and Trujillo's own testimony and statements. First, there is no testimony or objective medical evidence to support an onset date of December 1998. Trujillo had a first back surgery in about 1997. In 2002, he used Ibuprofen "occasionally." [*See, e.g.,* Tr. 123, 177, 259, 267, 298, 364.] He returned to work for a number of years after the first surgery until approximately 2003, and did not have a recurrence of back pain until March 2004, after which he had a second back surgery in January 2005. [Tr. 110, 113-19, 177, 259, 267, 317, 322, 376, 524, 526.] *See* Ross v. Astrue, 2008 WL 5111148 at *6 (W. D. Okla. Dec. 2, 2008)[24] (citing Eighth Circuit decision in which the court reasoned that the ability to work despite impairment suggested the claimant was not disabled).

Second, there were no references by Trujillo or his attorney to medical records that might support a disability before the DLI of December 2002. The only medical records produced in 2002 relate to a hospital visit by Trujillo for mental agitation related to amphetamine use. [Tr. 363, 364.]

Third, not only is there no medical evidence to support a disability before 2002, Trujillo himself reported to doctors more than once that his back had done well for years after the first surgery until he presented at the ER in March 2004. On December 10, 2004, the medical record indicates that Trujillo had done "remarkably well for six years" after the first surgery until February

---

[24]The Court cites to unpublished decisions for their persuasive value only.

2004 when he complained of lower back pain again and shooting pain on occasion.  [Tr. 267.]  As of April 6, 2004, Trujillo reported to his physician that he did auto painting and body work then and "still" rode a motorcycle but did not professionally race.  [Tr. 177.]  The medical notes in March and April 2004 indicate that Trujillo sought medical treatment then for a recurrence of back pain that had recently worsened.  [Tr. 177, 322, 324.]

Moreover, on the disability report filled out by Trujillo in September 2005, he wrote that the back problem first bothered him (again) on January 15, 2004 and that he was unable to work as of February 6, 2004.  [Tr. 93, 94.]  He stopped working as of 2004 because of pain.  He did auto body work from 1989-2003.  [Tr. 104.]  At the ALJ hearing, Trujillo testified under oath that he went to the ER on March 2004 because of back pain and leg problems.  He never testified that he had any problems with his back between the first back surgery and the LDI of December 2002.  Rather, he testified that he had back surgery in 1997 and returned to work full-time "more or less."[25]  [Tr. 526.]

The Court recognizes that generally when an onset date of disability must be inferred, the ALJ should consult a medical advisor at the hearing to determine the onset date.  Blea v. Barnhart, 466 F.3d 903, 909-910 (10th Cir. 2006); SSR 83-20.  In Blea, the Tenth Circuit Court of Appeals held, regarding the onset date of a disability, that an ALJ "may not make negative inferences from an ambiguous record; rather, it must call a medical advisor pursuant to SSR 83-20."  Blea, 466 F.3d at 913.  While the Court also held that the ALJ could not reasonably draw negative inferences from a lack of medical records, id. at 912, here, the record is not ambiguous as is described above.

---

[25]Also noteworthy but not before the ALJ, were Trujillo's statements to the psychiatrist in 2007.  The psychiatrist's report indicates that Trujillo reported his first back surgery in 1996 helped him but that he later had problems and a spinal fusion in 2005.  [Tr. 407.]

Based on the medical evidence and Trujillo's testimony, it was not error for the ALJ to amend the onset date of disability to March 2004, after the date of DLI. This amendment eliminated the DIB claim, but as stated above, there was absolutely no medical evidence to support a claim of disability before December 2002. Trujillo produced no evidence to support such a claim at that time, and indeed, the medical evidence and testimony is to the contrary. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.")

The Court rejects Trujillo's position that any withdrawal of the claim, under the circumstances of this case, had to be in writing.[26] Technically, Trujillo was neither attempting to nor agreeing to withdraw his claim in accordance with the regulation cited by his attorney. The reality was that because there was no evidence of disability prior to the LDI, Trujillo's DIB claim had no medical support and was effectively withdrawn because of a lack of support. *See, e.g.,* Gutierrez v. Barnhart, 2005 WL 1994289, at *2, 10 (5th Cir. Aug. 19, 2005) (because amended onset date post-dated claimant's date last insured for the Title II disability benefits by seven months, the ALJ found that the claimant effectively withdrew her application for Title II benefits and therefore dismissed her Title II application).

---

[26]Although not a request to withdraw, the disability report filled out by Trujillo in about September 2005, where he stated that his back problems first bothered him on January 5, 2004, and that he became unable to work as of February 6, 2004 [Tr. 94] is a writing that essentially defeats any claim that he was disabled prior to the DLI of December 2002.

The Court concludes that Trujillo received a fair hearing on his claims and that no error was committed. It goes without saying that the record could not have been more fully developed[27] when Trujillo, through counsel, represented Trujillo had no medical support to establish he was fully disabled before the LDI. This statement was candid, forthright and consistent with counsel's duty of candor to the tribunal. Indeed, as Trujillo's attorney, counsel was authorized to and had the right to "make statements about facts and law" consistent with representations that Trujillo's attorney made in this case, which were supported by the record evidence. 20 C.F.R. 404.1710(a)(3).

**2.      SSI CLAIM; STEP THREE EVALUATION; LISTING 1.04**

At step three of the sequential evaluation, the ALJ determines whether Trujillo's impairment "is equivalent to one of a number of listed impairments that the Secretary acknowledges as so severe as to preclude substantial gainful activity." Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996) (internal citation omitted). Plaintiff has the burden to present evidence establishing her impairments meet or equal a listed impairment. Doyal, 331 F.3d at 760. Generally, the ALJ is "required to discuss the evidence and explain why he found that the [claimant] was not disabled at step three."

---

[27]Trujillo argued that the ALJ's duty to further develop the record was triggered by the medical evidence in this case. [Doc. 16, p. 3.] First, Trujillo argued that the ALJ recognized there was a "gap" in the medical evidence between 2002 and March 2004. [Doc. 16, p. 3 citing Tr. 524.] Trujillo further contended that a number of medical records he cited "clearly showed the claimant had suffered a slowly progressing degenerative condition from the time of his first spinal fusion surgery in 1997 and a second spinal fusion surgery in 2005." [Doc. 16, p. 3 citing Tr. 205-06, 210-11, 223, 233, 247, 506.] The Court expresses concern with the representations and citations to the record here and in other parts of the briefing, some of which appear to be incorrect. For example, at page 524 of the ALJ hearing, the ALJ discussed Trujillo's need to leave his job in 2002 and then the reasons for his visit to the ER in early 2004, but the ALJ neither expressed concern nor noted a "gap" in the evidence. Moreover, it is claimant's duty to come forward with evidence to support a disability before the LDI and here, Plaintiff, through counsel and his own testimony, stated he continued to work in that time frame and did not have back problems until March 2004. Of even more concern is counsel's argument that the cited records showed Trujillo suffered from a "slowly progressing degenerative condition from 1997 to 2005." None of the cited records state this. That may be counsel's interpretation of the records, but none of the orthopedic specialists or other health care providers, whose records he cited, actually say Trujillo had a "slowly progressing degenerative condition" from 1997 to 2005. [Tr. 205-06, 210-11, 223, 233, 247, 506.] In addition, counsel's statement that Trujillo had a spinal fusion in 1997 appears to be incorrect. It is correct that Trujillo reported a fusion in 1997, but later doctors found no evidence of a fusion from 1997. [Tr. 267: "no evidence of previous fusion" per x-ray.]

Clifton, 331 F.3d at 1009 (internal citations omitted).  In Clifton, the Tenth Circuit Court of Appeals reversed a decision denying SSI benefits because the ALJ did not discuss the evidence or his reasons for determining that the claimant did not meet a listing level at step three.  Because the ALJ's "bare conclusion" was beyond meaningful judicial review in that case, the Court remanded.  Id.

In Fischer-Ross v. Barnhart, the Tenth Circuit elaborated on what was necessary at step three.  Fischer-Ross, 431 F.3d 729 (10th Cir. 2005).  The question before that Court was whether Clifton required reversal "where the ALJ's factually substantiated findings at steps four and five of the evaluation process alleviates *any* concern that a claimant might have been adjudged disabled at step three."  Id. at 730 (emphasis in original).  The Tenth Circuit held that Clifton did not require reversal under those circumstances.  While the Court encouraged ALJ's to render complete findings and conclusions at every step of the sequential evaluation, the Court rejected any conclusion that would lead to unwarranted remands that needlessly prolonged administrative proceedings.  Id.

In Fischer-Ross, the Court acknowledged that the ALJ had not provided specific findings at step three, but found the error was harmless.  The Court reasoned that "Clifton sought only to ensure sufficient development of the administrative record and explanation of findings to permit meaningful review."  Id. at 734.  In Clifton, the ALJ's RFC findings were sparse, whereas in Fischer-Ross, the ALJ made far more substantial findings at step four.  Id.  Thus, the Tenth Circuit "declined to review an ALJ's conclusory determination at step three in an isolated manner separate from the rest of the ALJ's decision."  Id. n. 5 (internal citations omitted).

The Court concluded in Fischer-Ross that the ALJ's findings at step four and five defeated any notion that the claimant in that case met listing requirements.  "[T]he ALJ's confirmed findings at steps four and five . . ., coupled with indisputable aspects of the medical record, conclusively

43

preclude[d] Claimant's qualification under the listings at step three."  Id. at 735.  Thus, any error at

step three for failure to provide detailed explanations for the ALJ's decision was harmless.  Id.

Here, the ALJ's step three findings were brief but not without explanation.  He concluded

that Trujillo did not have an impairment or combination of impairments that met or medically

equaled a listing.  [Tr. 29.]  In support of that finding, the ALJ wrote:

> I have reviewed section 1.04 of the Listing of Impairments.  As noted
> herein, the claimant has been diagnosed with several back and neck
> disorders.  However, there is no positive evidence indicating that the
> claimant has had significant limitation of spinal motion, reflex loss,
> etc., during the time periods at issue.

[Tr. 30.]  The ALJ then noted he had carefully considered the entire record in reaching his step four

findings, which were extensive and summarized a significant number of Trujillo's many medical

records.  [Tr. 30-35.]

Trujillo first conceded that the objective evidence with respect to Trujillo's back impairments

"did not clearly meet this listing [1.04]. . . ."  [Doc. 12, p. 8.]  However, Trujillo argued that "the

ALJ failed to address the objective findings that demonstrated claimant's multiple spinal disorders

had come to equal the listing at least by December 2005 [or January 2006] but had prevented him

from gainfully working since 1998."[28]  [Doc. 12, p. 8.]  The Court understands Trujillo's argument

to be that the objective medical evidence "documenting [Trujillo's] multilevel spinal stenosis when

viewed in combination with [his] chronic cervical degenerative spinal condition at the very least

equaled the requirements of medical Listing 1.04. . . ."  [Doc. 12, pp. 11-12.]  In other words, it is

Trujillo's position that by December 2005 or January 2006, the combination of his cervical and

lumbar spinal conditions met listing 1.04 requirements.  [Doc. 12, p. 8.]  According to Trujillo,

_____

[28]Clearly, the argument that these impairments prevented Trujillo from being gainfully employed since
1998, is mistaken since Trujillo conceded that he had worked well beyond 1998.

neither the cervical nor the lumbar spinal conditions "individually" met the listing requirements, but in combination, they equaled that listing.  [Doc. 16, pp. 5-6.]

The requirements of Listing 1.04 are:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.

With:

A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower pack, positive straight-leg raising test (sitting and supine);

or

C.   Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Listing 1.04.[29]

The ALJ's intensive discussion of the medical records indicates that the ALJ took great care in considering Trujillo's condition.  Indeed, he did not always agree with state agency doctors' evaluations, and he discussed inconsistencies in treating doctors' evaluations.  For example, in September 2004, the state agency doctor concluded that Trujillo could perform a full range of light work.  [Tr. 31.]  The ALJ disagreed.  Based on the medical evidence, he resolved all doubts in Trujillo's favor and found he could not perform the required amount of standing and walking required for light work.  [Tr. 31.]  In addition, a treating doctor stated that Trujillo had had a

---

[29]Trujillo omitted paragraph "B" of 1.04; thus, the Court infers that he does not contend Trujillo met that portion of 1.04.  [Doc. 12, p. 8.]

successful post-operative "course" after the second surgery in 2005.  [Tr. 32.]  But, the ALJ observed that not too long after that surgery, Trujillo complained of persistent low back pain and sought emergency medical treatment because of back pain.  [Tr. 31-32.]

The ALJ also discounted Dr. Ortega's December 2005 work assessment form based on Dr. Ortega's express statements that his assessment of limitations resulted from an interview and the statements of Trujillo.  [Tr. 32.]  There appears to be no argument by Trujillo regarding the ALJ's determination as to the weight given that assessment.

Instead, Trujillo's primary argument is that the medical records and testing indicate that, at least as of December 2005 and January 2006, he had two qualifying spinal disorders (lumbar spinal stenosis and degenerative disc disease of the cervical spine) that taken together equaled the requirements of Listing 1.04.  [Doc. 16, p. 6.]  In setting forth his position, Trujillo's counsel again provides some questionable cites and argument.  (*See supra* n. 26.)  Trujillo asserts that in December 2005, he complained about clumsiness of the bilateral upper extremities and neck pain, and that as a result of these symptoms, he was referred for a cervical MRI.  He argues that "[t]he ALJ did not address this evidence in his opinion."  [Doc. 12, p. 9, citing Tr. 211.]

In his opinion, the ALJ discussed the very same medical record [Tr. 211] where Trujillo reported he had fallen six times because of lower extremity weakness.  [Tr. 32.]  The ALJ's decision notes:

> He primarily complained of neck pain.  The orthopedist ordered an MRI of the claimant's cervical spine which showed some disc protrusions.  In addition, this doctor ordered x-rays of the claimant's cervical spine which were positive for a herniated nucleus pulposus with a very small disc protrusion.

[Tr. 32.]  Thus, it is obvious that the ALJ discussed the cervical MRI and results, the cervical x-ray and results, and portions of the December medical record.  What the ALJ did not repeat in his decision was the complaint on that date about Trujillo's feelings of clumsiness.  However, "an ALJ is not required to discuss every piece of evidence."  Clifton, 97 F.3d at 1009-10.  Moreover, listing 1.04 does not specifically require a showing of "clumsiness."

Neither the ALJ nor Plaintiff's counsel discussed the physician's findings on December 7, 2005, that Trujillo strengths were "five out of five," "he had a negative straight leg raise bilaterally," bilateral upper extremities and neck showed negative Spurling's limited flexion, extension of the neck, median and ulnar motor nerve roots were grossly intact, grip strength, biceps and triceps and deltoid were five out of five in strength.  [Tr. 211.]  Three views of the C-spine demonstrated adequate alignment of the vertebral bodies.  No spondylolisthesis or subluxations or fractures were identified.  "EMG . . . of the bilateral lower extremities were within normal limits.  CT myelogram did not show any filling defects of the L-spine."  [Tr. 211.]

A reviewing court is not permitted to pick, choose and discuss only the part of the record that supports the court's analysis and disregard those parts that do not support the analysis.  *See* Hardman v. Barnhart, 362 F.3d 676, 681 (10th Cir. 2004) (holding that "[i]t is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence.")  So, too, a claimant's advocate should not ignore those portions of the record which refute the claimant's argument.  For example, in discussing testing results  [Doc. 12, p. 9], Trujillo, he fails to note that along with the showing of right C5-C6 shallow disk protrusion, "which might impinge on the anterior surface of the spinal cord" and "probable mild right neural foraminal narrowing at this same level," the test result also stated "signal intensity over the

visualized marrow space is normal," the C2-C3; C3-C4, and C4-C5 intervertebral disks are unremarkable, a right paracentral disk protrusion at C5-C6 might slightly impinge on the right anterior surface of the spinal cord, and there is a minimal disk bulge at C6-C7.  [Tr. 209.]

Plaintiff's counsel also observes that in August 2005, Trujillo was ordered to undergo a CT myelogram to determine the objective causes of his continued lower extremity pain, weakness, right buttock pain and thigh pain.  Counsel further states that the ALJ did not address any of the foregoing evidence in the decision.  [Doc. 12, p. 11, citing Tr. 233.]  That argument, however, fails to find record support.

First, the record [Tr. 233] states that because of the hardware in place, the MRI had been significantly limited.  Thus, Trujillo was to get a CT myelogram "to further assess for any continued spinal stenosis or radicular compression."  Second, Trujillo was also to obtain an EMG study of the bilateral lower extremities to evaluate for any neurologic deficits, which Plaintiff's counsel does not mention.  [Tr. 233.]  On September 8, 2005, Dr. Reyna discussed the EMG examination and result.  [Tr. 229.]  On examination, Dr. Reyna found no weakness or atrophy in the muscles of the right or left lower extremity.  Dr. Reyna saw no sign of lumbosacral nerve root dysfunction either clinically or electrically.  "I do not know what his causing his persistent discomfort and episodes of leg weakness."  [Tr. 229.]

Similarly, the  myelogram of the lumbosacral spine indicated "moderate spinal stenosis at L2-L3 secondary to a disc bulge and mild spinal stenosis identified at the L3-L4 level secondary to mild retrolisthesis."  [Tr. 223.]  But, the report also noted that there was no evidence of contrast block identified at any level; "it was free flowing throughout the thecal space."  There is normal

curvature of the lumbar spine.  There was a broad based disc bulge at L2-L3; no residual disc bulge

was identified at L4-L5 or at the L5-S1 level.  [Tr. 223.]

Also <u>not</u> noted by Plaintiff's counsel is the neurosurgeon's report, dated November 8, 2005,

after Plaintiff had the EMG and myelogram.  [Tr. 504.]  Dr. Ortega referred Plaintiff to see Dr.

Metzger, whose report  noted that Trujillo was there because of neck and right shoulder pain.  There

was no radiation of pain down his arms, while there was some numbness in his hands bilaterally.

Dr. Metzger reported that Trujillo had degenerative disk disease at C5-C6 and C6-C7, but that he

did not think surgery was in his best interest.  Dr. Metzger wrote:

> Much of what he is describing in his neck sounds like paraspinous
> muscle spasm rather than radiculopathy which fits with the fact that
> he has straightening of the cervical lordosis and no significant neural
> compression on the MRI scan.  The hand numbness that he is
> describing, likely represents carpal tunnel syndrome and I suggested
> that he might want to consider an EMG to further work this up.  I do
> not think that the hand numbness relates to the cervical spine
> pathology and there is no cord compression that could explain this.

[Tr. 504-05.]

The ALJ acknowledged in the written decision that two different impairments were at issue:

the back and neck disorders.  [Tr. 30.]  He found Trujillo had severe back and neck disorders with

low back, neck and bilateral low extremity pain.  [Tr. 29.]  Thus, he was considering both the back

and neck impairments when he made his step three findings.  The ALJ determined Trujillo did not

meet a listing level (for 1.04 specifically) because there was insufficient evidence to show he had

significant limitation of "spinal motion, reflex loss, etc."  While not extensive findings, they are

findings.

Moreover, the Court concludes that substantial evidence supports the ALJ's step three

findings, much of which the ALJ discussed at step four of the sequential evaluation.  For example,

Trujillo had no focal deficits involving his motor strength, sensation, or reflexes in his lower extremities.  He had no numbness in his lower extremities and some mild to moderate spondylosis with degenerative disc disease in his cervical spine.  In late 2005, Trujillo's primary medication was Ibuprofen.  A recent EMG study showed no signs of nerve root compression.  The MRI of his cervical spine showed some disc protrusions.

At the hearing, Trujillo testified that he could not sit or stand for long, but that he could walk for 45 minutes.  [Tr. 33.]  Trujillo was able to take care of his children, prepare meals, go shopping regularly and take the children swimming, as well as do household chores daily.  In a medical source statement regarding Trujillo's ability to work, filled out on July 2006, the physician found no limitations on Trujillo's ability to sit and no limitations in his ability to finely manipulate fingers or hands.  [Tr. 382.]

The record further shows that as of January 18, 2006, Trujillo complained of clumsiness but did not have numbness or tingling or other radicular symptoms.  [Tr. 205.]  No weakness was noted in the bilateral upper or lower extremities that day.  Median and motor nerve root nerves were grossly intact.  He had a negative straight leg raise bilaterally.  He was able to do heel-to-toe tandem gait.  [Tr. 205.]

A little earlier on December 7, 2005, Trujillo complained of clumsiness in his upper extremities but did not complain of weakness, numbness or tingling in the upper extremities.  [Tr. 211.]  The bilateral straight leg raises were negative on this date as well.  An ER visit in late November indicated that there was no evidence of nerve root compression in a recent EMG study.  [Tr. 217.]

The Court concludes that there is substantial evidence to support the ALJ's findings at step three and that no error was committed.  Trujillo did not satisfy his burden of establishing that his impairments met or equaled listing 1.04.  While he met certain threshold requirements of 1.04, e.g., herniated nucleus pulposus and degenerative disc disease, he failed to satisfy all the requirements of 1.04, including, but not limited to, compromise of a nerve root or the spinal cord, nerve root compression, positive straight-leg raising or "pseudoclaudication."[30]  There is no medical or testimonial evidence showing Trujillo's back impairments resulted in pseudoclaudication.  The record citations Trujillo argues support a 1.04(C) Listing discuss his spinal conditions but never diagnose him with or mention pseudoclaudication.  Without record evidence showing Trujillo's degenerative disc disease or other back conditions resulted in pseudoclaudication, Trujillo failed to satisfy Listing 1.04(C).  *See* Meier v. Astrue, 2008 WL 4787171 at *9 (N.D.Iowa, Oct. 27, 2008) (internal citation omitted).

## 3.    SSI CLAIM; STEP FIVE; VE TESTIMONY

In deciding his SSI claim at step five of the sequential evaluation, the ALJ obtained testimony from a VE and later relied on that testimony to support the finding that Trujillo was capable of performing the occupation of Surveillance Systems Monitor.  The ALJ determined that Trujillo had the RFC to perform a limited range of sedentary work on a sustained basis that is simple and unskilled in nature.  In so finding, the ALJ examined Trujillo's allegations regarding difficulties with concentration and memory and resolved those in his favor.  Thus, the ALJ limited his RFC to performing simple tasks.  [Tr. 33-34.]

---

[30]Plaintiff's counsel concludes that there was evidence to show Trujillo suffered from pseudoclaudication. [Doc. 12, p. 11, n. 3; Doc. 16, p. 5.]  However, the Court reviewed the cites to the medical evidence and did not locate any physician who concluded that he suffered from pseudoclaudication.

At the ALJ hearing, the ALJ asked the VE whether Trujillo could perform his past relevant work which was medium in exertional level and at least semiskilled in nature.  Based on the limitations presented to the VE, she testified that he could not perform his PRW, and the ALJ concurred with the VE's testimony.  [Tr. 34.]

At step five of the sequential evaluation, the ALJ noted Trujillo's younger age and his education (although he actually did not have a high school education).  The ALJ observed that transferability of job skills was not material to the disability determination because using the grids as a framework supported a finding that Trujillo was not disabled.  Thus, considering his age, education, work experience, and RFC, the ALJ found that jobs existed in significant numbers in the national economy that Trujillo could perform.  [Tr. 34-35.]

The ALJ explained that while Trujillo could perform sedentary work, he could not perform all of the requirements of sedentary work because of additional limitations.  At the hearing, the ALJ asked the VE to assume that the claimant could not crouch or kneel, could lift 10-20 pounds, could perform some sitting and standing, and could walk for 45 minutes, and additionally that he could perform only simple tasks.  [Tr. 34-35, 548.]

The VE testified:

> A simple task might be the surveillance system monitor and these are individual [sic] who are in the security position in a facility where they're sitting and viewing a computer screen and looking at various parts of the, the building.  And the DOT number is 379.367-010.  It's sedentary.  It's unskilled – the skilled level is two.  And the individual is basically – there's no public contact and they're basically looking at the screen.

[Tr. 548.]  The ALJ asked the VE if her testimony was consistent with the Dictionary of Occupational Titles ("D.O.T."), and she said it was.  [Tr. 548.]  In his written decision, the ALJ

determined that "pursuant to SSR 00-4p,"[31] the VE's testimony was consistent with the information in the D.O.T.  [Tr. 35.]

Trujillo contends that the ALJ's reliance on the VE's testimony was legal error because the VE's testimony was inconsistent with the D.O.T.  First, he argues that the VE's testimony that a "simple task *might* be the surveillance system monitor," indicates that the VE was uncertain whether Trujillo could perform the position.  The Court does not read the VE's testimony in this manner and instead, interprets her testimony to mean that a position, consisting of simple tasks, that Trujillo could perform would be that of a surveillance system monitor, implying that there *might* be other positions as well.

However, because the Court decides to remand as to Trujillo's second argument on this point – that the D.O.T. requirements for a surveillance system monitor may conflict with the ALJ's hypothetical that Trujillo was limited to performing "only simple, unskilled work tasks" – upon remand, the ALJ  or VE can elaborate on her use of the term "might."  [Tr. 35.]

The D.O.T. description of the surveillance system monitor position provides the following codes after the explanation of job duties:  GED: R3 M1 L3 SVP: 2.  [Doc. 12, Ex. A.]  The code "R3" indicates that a reasoning development code ("R") is rated as a "3" for that position.  The D.O.T. defines skill 3 reasoning (R3) as requiring the ability to:

> Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form.  Deal with problems involving several concrete variables in or from standardized situations.

---

[31]SSR 00-4p requires an ALJ to resolve conflicts between the D.O.T. and a VE's testimony "by determining if the explanation given by the VE ... is reasonable and provides a basis for relying on the VE ... testimony rather than on the DOT information." SSR 00-4p, 2000 WL 1898704, at *2.

Trujillo notes the ALJ's findings that Trujillo has "some concentration difficulties secondary to his home and work situation," and is therefore limited to "simple tasks." He argues that the VE must explain the discrepancy between her testimony that the surveillance system monitor was a "simple" occupation and the D.O.T.'s classification of R3 that conflicts with a limitation of simple work tasks or instructions.

It appears from the Court's review of case law, that there might not be a conflict between the limitation to simple, routine, repetitive, concrete tasks with a GED reasoning development level of two, *i.e.,* R2. *See* Hackett v. Barnhart, 395 F.3d 1168, 1175 (10th Cir. 2005) (stating that "level-two reasoning appears . . . consistent with the Plaintiff's RFC:" to "simple and routine work tasks"). However, there is no case law supporting a finding that a limitation to simple tasks is consistent with a reasoning development level of three (R3). *See, e.g.,* Carter v. Barnhart, 2005 WL 3263936 at *2-4 (D. Me. Nov. 30, 2005 (remanding based on claimant's argument that the limitation to simple, repetitive tasks rules out the surveillance system monitor job because the R3 level is "far beyond the limitation to simple, repetitive tasks;" and noting other similar decisions in which the court remanded for the same reasons); Smethers v. Barnhart, 2005 WL 417800 at *5 (E. D. Pa. Feb. 22, 2005) (remanding based on an "apparent unresolved conflict" between the VE's testimony and the DOT when the claimant argued that a reasoning development level of two or three conflicted with limitations to "simple 1-2 step tasks").

The Commissioner argued the Tenth Circuit's remand in Hackett, which dealt with an almost identical argument and the same position of surveillance system monitor, is distinguishable because in that case, the Court limited the claimant to simple and routine work as opposed to simple,

unskilled work as is true in this case.  Thus, the Commissioner asserts that because the ALJ did not limit Trujillo to "routine" work, <u>Hackett</u> is not on-point.  [Doc. 15, p. 14.]

The Court is unconvinced by this argument and concludes that a remand is appropriate so that the ALJ can ask the VE, at a limited rehearing, how her testimony regarding the identified job corresponds with the D.O.T. description and also elicit a reasonable explanation for any discrepancies. If the VE's testimony appears to conflict with the D.O.T., the ALJ must obtain a reasonable explanation for the apparent conflict. This remand is limited in nature and does not require the ALJ to conduct a new hearing regarding the analysis in steps one to four, unless made necessary by the results of the step five rehearing.  The ALJ may or may not need to address the issue of whether Trujillo has a high school education during the rehearing and step five analysis.

## 4.      APPEALS COUNCIL; LAY WITNESS TESTIMONY

Trujillo argues that the Appeals Council failed to consider the later submitted lay witness testimony by Trujillo's father-in-law and his significant other.  [Tr. 418, 421.]  Trujillo claims that while the Appeals Council accepted the new evidence for review, it did not provide any specific rationale underlying its rejection of the request for review.  More specifically, Trujillo asserts that the Appeals Council disregarded or rejected the testimony by lay witnesses, both of whom addressed the time frame prior to the DLI of December 31, 2002.  [Doc. 12, p. 23.]

In its "Notice," the Appeals Council observed that it considered the reasons Trujillo disagreed with the ALJ's decision "and the additional evidence listed on the enclosed Order of Appeals Council," including the statements made in mid-2007 by Trujillo's father-in-law and his significant other.  [Tr. 8, 12.]  Indeed, in its "Notice," the Appeals Council addressed at length the additional   medical   evidence   submitted   by   Trujillo   (specifically,   Dr.   Morgan's

psychological/vocational evaluation). [Tr. 9.] The Appeals Council also noted that Dr. Morgan had reviewed the statements by lay witnesses, including testimony that Trujillo had used a cane regularly for five to six years. The Appeals Council further observed that the medical evidence of record revealed that a cane had not been prescribed, that Trujillo's lower extremities were consistently described as having 5/5 strength with no atrophy, and that Trujillo had been noted to walk without difficultly and without assistance. [Tr. 9.]

The Appeals Council is not required to do more. Martinez v. Barnhart, 444 F.3d 1201, 1207-08 (10th Cir. 2006). In Martinez, the claimant argued that the Appeals Council should have specifically discussed the effect of newly submitted treatment records, in light of the record as a whole. The Tenth Circuit observed that an express analysis in the Appeals Council's determination would have been helpful for purposes of judicial review but was not required by statute or regulation. Id.

The Appeals Council stated that it had considered the reasons Trujillo disagreed with the ALJ's decision and had considered the additional evidence provided by Trujillo. [Tr. 8.] In addition, it stated it had not found that the information provided a basis for changing the ALJ's decision. [Tr. 9.] Moreover, as is clear by the Appeals Council's explicit review of some of the new evidence, it did consider the testimony of lay witnesses but found no basis for rejecting or amending the ALJ's decision. [Tr. 9.]

Therefore, the Court concludes that the Appeals Council adequately "considered ... the additional evidence," meaning that it "evaluate[d] the entire record including the new and material evidence submitted." Martinez, 444 F.3d at 1207 (citing 20 C.F.R. § 404.970(b)). Accordingly, the

Court finds the Appeals Council committed no error in not discussing the lay testimony more than it did.

In addition, the Court observes that it considered the entire record, including all records and statements submitted to the Appeals Council, in determining whether substantial evidence supported the ALJ's decision or whether the ALJ committed error.

## VI.  CONCLUSION

For all of the above-stated reasons, the Court determines that Leroy Trujillo's Motion to Remand is GRANTED to the extent that upon remand, the ALJ must conduct a limited rehearing at step five to determine whether there was a conflict between the VE's testimony and the information in the D.O.T., and if so, whether there was a reasonable explanation for any discrepancy.

Lorenzo F. Garcia
Chief United States Magistrate Judge